**William KRAUS**

v.

**CONSOLIDATED RAIL CORPORATION.**

**Ronald SHOEMAKER**

v.

**CONSOLIDATED RAIL CORPORATION.**

**Wayne OWENS**

v.

**CONSOLIDATED RAIL CORPORATION.**

**Charles BARBER**

v.

**CONSOLIDATED RAIL CORPORATION.**

**Civ. A. Nos. 87–5905, 88–2509, 88–5101 and 88–5878.**

United States District Court, E.D. Pennsylvania.

Aug. 28, 1989.

J. Michael Farrell, Sleet & Farrell, Philadelphia, Pa., for plaintiffs.

Jonathan Altman, Richard L. Goerwitz, Jr., Swartz, Campbell & Detweiler, Stanley S. Frazee, Jr., Philadelphia, Pa., for Conrail.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

In these consolidated actions brought pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. [section] 51 *et seq.*, four former railroad employees allege that they were injured as a result of defendant Conrail's failure to provide them with a safe workplace. Conrail maintains, however, that the FELA does not impose liability on employers for purely emotional or stress-related "injuries." Before the court are defendant's consolidated motions for summary judgment.

### I. BACKGROUND

Summary Judgment must be granted "if the pleadings, deposition, answers to interrogatories, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). For the purpose of these consolidated motions, plaintiffs' allegations will be accepted as true.

Each of the four plaintiffs worked for a period of time as a Conrail train dispatcher, and each now allegedly suffers from emotional or stress-related "injuries." Plaintiffs Kraus, Shoemaker and Barber suffer from physical as well as emotional disorders purportedly caused by on-the-job

stress. Plaintiff Owens' alleged disability is purely "emotional" in nature.

### (a) *William Kraus*

Plaintiff Kraus began working as a Conrail train dispatcher in March 1987 after seventeen years as a block operator. Plaintiff contends that since 1978 Conrail began to consolidate job responsibilities and territories. Various support groups were eventually eliminated in a workforce reduction characterized by Kraus as "drastic."

Plaintiff describes his job as generally stressful, chaotic, and unsafe due to the heavy workload and pressure created by the consolidation of positions and reduction in force. While working for Conrail, Kraus allegedly suffered from dizzy spells, blackouts and exhaustion. Although he complained to supervisors about the workload and working conditions, he never filed a written grievance with his union.

According to Kraus, a train dispatcher is concerned with the safe movement of trains. Among other things, he monitors a radio system, prepares daily reports on accidents and delays, informs railroad personnel of maintenance assignments, and keeps track of crew changes to ensure proper staffing. Dispatchers also work considerably with computers that monitor the movement of trains.

Kraus maintains that March 12, 1987 was a typically stressful and chaotic day. He received and made a large number of telephone calls and had a backlog of data to feed into the computer. Local freight trains—causing congestion on the rails—awaited his permission to move. A bridge had "failed," and his supervisors complained about his being behind schedule. As a result of these demands, plaintiff mistakenly permitted a train to proceed through a stop signal, threatening the life of an electrician who was working on the tracks. After plaintiff tried unsuccessfully to stop the train, he became anxious and began to sweat. Plaintiff described March 12 as "hectic ... as most days were hectic. They brought a lot of tension to the job in

anxiety and stress, and specifically there was no incidents." Pl.Dep.Tr. 23.

Approximately one week earlier, two dispatcher desks had been consolidated—over union objection—increasing the territory for which plaintiff was responsible from 225 miles to 450 miles. Plaintiff did not file any grievance based on the consolidation. He did, however, raise the issue with the duty train operations officer and was told that studies would be done before implementation of the consolidation.

On March 27, 1987, plaintiff experienced chest pains, nausea, and sweating. He was admitted to a hospital where he remained for five days, two of which were spent in intensive care. Doctors determined that Mr. Kraus had not had a heart attack; however, his very real chest pains were caused by job-related stress.

Plaintiff stated at his deposition that he often thought and dreamed about collisions, derailments and other accidents.

### (b) *Ronald Shoemaker*

Plaintiff Ronald Shoemaker began working for the Reading Railroad as a tower/block operator on September 7, 1961 and remained in that position until February 8, 1969, when he was promoted to train dispatcher. During those years, plaintiff worked in a large office which he described as "well windowed," "well lit" and a "very nice office." In the performance of his duties, Mr. Shoemaker used a telephone system to control between eight to ten tower operators who directed the trains pursuant to his instructions.

After accepting the dispatcher position, plaintiff allegedly came under much stress. However, while he occasionally became physically ill when "things got hectic," he never received any medical treatment for any stress-related condition during that time. After Conrail became his employer on April 1, 1976, plaintiffs job duties changed considerably as his workload increased and he began working with new people and different territories.

In April 1984 or 1985, plaintiff allegedly faced more chaotic working conditions after a computer system had replaced certain

clerks and towers. With the new equipment, Shoemaker was required to use an earpiece during his entire eight hour shift in order to receive communications from operators. He describes the transmissions he received as a high squeal pitching noise. He also alleges that he sometimes received more than six messages at a time on his computer terminal screen. Disputes with supervisors concerning his performance also added to his stress.

On August 30, 1987, plaintiff felt discomfort in his right chest area while he was playing softball. He was taken to a local hospital and soon thereafter released. Later that evening, however, while watching television, plaintiff felt pain in the center of his chest. He was once again taken to a hospital where he was diagnosed as having suffered a heart attack (an acute myocardial infarction.)

### (c) *Charles Barber*

Plaintiff Barber was employed by the Reading Railroad as a block operator from 1965 until 1974, although he occasionally worked as a relief train dispatcher between 1968 and 1974. From 1974 to 1980, plaintiff served permanently as a train dispatcher. However, in 1980 he was dismissed from that position after having directed three passenger trains down an out-of-service track. He returned to his duties as a block operator and clerk before resuming his position as a train dispatcher in September 1983. From 1983 until July 1987, plaintiff worked as a train dispatcher or as an assistant chief train dispatcher, moving back and forth between the jobs as the duties of the jobs changed and as seniority dictated.

Between 1983 and 1987, there were changes in the manner in which these jobs were performed, caused by cuts in supporting manpower, realignment and consolidation of dispatching territories, as well as installation and utilization of computers and radios.

Prior to the commencement of his disability in July of 1987, plaintiff had had several years of medical treatment for emphysema. He was also hospitalized in early 1985 for ulcers. Afterwards, Mr. Barber continued to take medication for both conditions. Except for occasional stomach cramps, his stomach problems did not recur until July 30, 1987. On that date, plaintiff suffered a severe ulcer attack and has not returned to work.

### (d) *Wayne Owens*

Plaintiff worked for nearly twenty years as a train dispatcher, first with the Reading Company and later with Conrail. In October 1987, Mr. Owens stopped working after contracting bronchial pneumonia. He has not returned to work, as he feels "spent," "done in," "used up," and "burnt out." Plaintiff's emotional problems allegedly stem from certain safety and operating rule violations, reductions in force, the introduction and utilization of computers, loss of lunch and rest breaks, as well as disciplinary action taken against him for absenteeism and insubordination.

Mr. Owens' disability is solely emotional in nature. His treating physician states in a affidavit:

> The clinical picture that Mr. Owens presents is that of a severely emotionally disturbed individual who become overwhelmed with anxiety frequently and experiences frequent depressions ...
>
> I believe that Mr. Owens' occupation as a train dispatcher for Conrail played a major role on the production of this severe Generalized Anxiety Disorder and Depressive Neurosis. I believe also that Mr. Owens is totally disabled from returning to work as a train dispatcher. At this time, because of the severe degree of anxiety, depression and mental impairment which Mr. Owens suffers, I feel that he is disabled from doing any type of work.

## II. JURISDICTION

■ Defendant first maintains that plaintiffs fail to state a claim under the FELA because plaintiffs' alleged injuries occurred as a result of the performance of their normal duties, established under a collective bargaining agreement between defendant and plaintiffs' union, the Ameri-

can Train Dispatchers Association (ATDA). Defendant contends that these "minor disputes" can only be resolved by the National Railroad Adjustment Board ("NRAB") pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. [section] 151 *et seq.*

Defendant's argument is to some extent supported by the language and legislative history of the RLA since complaints of stress-related "injuries" can be easily described as grievances arising out of the interpretation or application of working conditions.

> [The RLA] refers to 'disputes concerning rates of pay, rules, or working conditions,' and to 'disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.' 45 U.S.C.A. [section] 151a. The Supreme Court has categorized the former as major disputes and the latter as minor ones ... The distinction is crucial because the Railway Labor Act contemplates and commands that the parties settle all 'minor' disputes through the grievance procedures. If such procedures fail, either party has the right of recourse to compulsory arbitration by way of appeal to the National Railroad Adjustment Board. 45 U.S.C. [section] 153 First (i) ...

*Reed v. National Airlines, Inc.,* 524 F.2d 456, 458–59 (5th Cir.1975). *See also, Atchison, Topeka and Santa Fe R. Co. v. Buell,* 480 U.S. 557, 562 & n. 9, 107 S.Ct. 1410, 1414 & n. 9, 94 L.Ed.2d 563, 571 & n. 9 (1987).

Few cases, however, have discussed the displacement of FELA tort remedies by the RLA. One such case, *Yawn v. Southern Ry.,* 591 F.2d 312 (5th Cir.), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 304 (1979), squarely undermines defendant's position. In *Yawn,* railroad workers alleged that the railroad negligently failed to provide adequate help and adequate time with which to do their jobs, thereby causing them to suffer physical pain, mental anguish, and gastrointestinal disturbances. The court concluded that plaintiffs' FELA claims were not barred by the RLA.

The basic theme of the railroads' argument is that since the employees' claims are in essence a minor dispute over working conditions, they must be submitted to grievance procedure resolutions. Although the "Adjustment Board is an expert body designed to settle 'minor' disputes that arise from day to day in the railroad industry," [citation omitted], the Board is not entrusted with the function of resolving personal injury claims. If an employee can establish physical injury caused by carrier negligence, his is entitled to damages under the FELA. Any allegation of railroad negligence in failing to provide an employee with sufficient help could be characterized as a dispute over working conditions. However, the fact that an employee suffers injury because of unsafe working conditions does not preclude access to the FELA.

> \*    \*    \*    \*    \*    \*

The source of these employees' right not be negligently injured is not found in the collective bargaining agreement but derives from an express statutory provision designed to provide employees a means of compensation for on-the-job injuries resulting in whole or in part from the railroad's negligence.

*Id.,* 591 F.2d at 317.

Judge Posner, however, writing for the Seventh Circuit in *Lancaster v. Norfolk and Western Ry. Co.,* 773 F.2d 807, 813 (7th Cir.1985), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987), moved beyond the jurisdictional issue and concluded that a plaintiff did not state a claim under the FELA.

> The reason why the question whether the Railway Labor Act supplants any part of the Federal Employer Liability Act tends not to arise might be the following: the FELA does not create a cause of action for tortious harms brought about by acts that lack any physical contact or threat of physical contact—an act such as telling a man he's fired, which is precisely the type of act for which the Railway Labor act provides a swift and adequate remedy.... Although [*Yawn*] points

the other way, we find its analysis unpersuasive. Clerical employees claimed to have suffered physical and mental strain because the railroad had not given them enough help for them to be able to do their jobs adequately. In holding that the railroad's conduct might be actionable under the FELA, the court pointed out correctly that a railroad worker who incurs physical or mental injury from unsafe working conditions has an FELA claim.... But the complaint was not that working conditions were unsafe; it was that clerical employees had been given too much—not too dangerous—work to do. That is not our idea of an FELA claim; it has nothing to do with the security of the person from physical invasions or menaces.

*Id.*, 773 F.2d at 813.

Two years after *Lancaster*, however, the United States Supreme Court did much to put this jurisdictional question to rest, specifically being asked to determine "whether the possibility of pursuing a labor grievance under the RLA deprives an employee of his right to bring an FELA action." *Atchison, Topeka and Santa Fe R. Co. v. Buell*, 480 U.S. at 559, 107 S.Ct. at 1412, 94 L.Ed.2d at 569. The plaintiff in *Buell* was a carman employed by defendant railroad who alleged that

he had suffered severe personal injuries as a result of the Railroad's failure

"to provide [him] with a safe place to work, including, but not limited to, having fellow employees harass, threaten, intimidate [him], and in particular, foreman Ed Wright threatened, harassed, and intimidated [him] maliciously and oppressively, negligently, and intentionally, in order to cause personal injury to [him] and to cause mental and emotional suffering. All said acts were condoned and approved by [the Railroad] and as a direct and proximate result of said negligence and intentional acts, [he] was caused to suffer an emotional breakdown, thus inflicting on him injuries and damages as hereinafter alleged."

*Id.*, 480 U.S. at 559, 107 S.Ct. at 1412, 94 L.Ed.2d at 569.

After noting that the "FELA is a broad remedial statute" that has been liberally construed "to accomplish [Congress'] objects," *Id.*, 480 U.S. at 562, 107 S.Ct. at 1414, 94 L.Ed.2d at 571, the Court concluded that Buell's FELA claim was not barred by the RLA.

The fact that an injury otherwise compensable under the FELA was caused by conduct that may have been subject to arbitration under the RLA does not deprive an employee of his opportunity to bring an FELA action for damages. Presumably a host of personal injuries suffered by railroad employees are caused by negligent practices and conditions that might have been cured or avoided by the timely invocation of the ·grievance machinery [footnote omitted]. *See Yawn ... 591 F.2d 312, 317.* .. But we have never considered that possibility a bar to an employee's bringing an FELA claim for personal injuries, and the Railroad has not persuaded us to do so now.

\* \* \* \* \* \*

The FELA not only provides railroad workers with substantive protection against negligent conduct that is independent of the employer's obligations under its collective-bargaining agreement, but also affords injured workers a remedy suited to their needs, unlike the limited relief that seems to be available through the Adjustment Board [footnote omitted]. It is inconceivable that Congress intended that a worker who suffered a disabling injury would be denied recovery under the FELA simply because he might also be able to process a narrow labor grievance under the RLA to a successful conclusion.

*Id.*, 480 U.S. at 564–65, 107 S.Ct. at 1415, 94 L.Ed.2d at 572–73.

Defendant correctly notes that the Court in *Buell* still recognized that certain types of disputes fall within the exclusive jurisdiction of the RLA. *See Buell*, 480 U.S. at 565, 107 S.Ct. at 1416, 94 L.Ed.2d at 563.

[C]ourts have declined to assume jurisdiction over claims of wrongful dis-

charge, [*see Andrew v. Louisville & Nashville R. Co.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), *cited approvingly in Buell*, 480 U.S. at 565–66, 107 S.Ct. at 1416, 94 L.Ed.2d at 573 (railroad worker alleged that he was "wrongfully discharged" when not permitted to return to work after accident) ], or of intentional infliction of emotional distress arising out of a discharge, *see Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367 (9th Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). They have also refused to consider claims arising out of nontermination disputes where the employee's rights arise solely out of the employment contract itself. *E.g., American Federation of Railroad Police (AFRP) v. National Railroad Passenger Corp. (Amtrak)*, 832 F.2d 14, 17 (2d Cir.1987) [ (Amtrak police union challenged railroad policy of ejecting homeless and other "undesirable" persons from station) ]; *Evans v. Central of Georgia R. Co.*, 619 F.Supp. 1364, 1369 (N.D.Ga.1985) [ (black railroad employee brought Section 1981 action alleging harassment and discrimination by railroad) ]. However, courts have refused to classify disputes outside these categories as minor, especially where the "limited" relief of backpay and reinstatement available through the Adjustment boards is unsuitable as a remedy, *see Buell*, 107 S.Ct. at 1415–16 & n. 12, or where the claim is incidental to the employment relationship and to the interpretation of the employment agreement, *see Lancaster* ... [ (railroad employee was victim of assault, battery and/or negligent infliction of emotional distress at hands of supervisor dissatisfied with employee's performance) ]; *Buell* ... *Merola v. National R. Passenger Corp.*, 683 F.Supp. 935, 938 (S.D.N.Y.1988).

Simply put, defendant contends that plaintiffs' alleged rights arise solely out of the collective bargaining agreement (CBA). Only there, defendant maintains, can plaintiffs hope to find the right to do only some kinds of work, within certain hours, and with specific assistance—that is, the right to face fewer job-related pressures.[1] Defendant implies that plaintiffs might avoid the collective bargaining procedure of the RLA and open a Pandora's box of federal litigation brought by disgruntled workers. Indeed, artful drafting of complaints alleging stress–related injuries could eviscerate the effectiveness of the RLA and turn many simple contract disputes into FELA suits. Despite the court's appreciation of the problems that might arise from FELA litigation in the stress-injury context, the letter and spirit of *Buell* make clear that FELA jurisdiction lies in this case. The court would lack jurisdiction only if the plaintiffs' alleged rights come *solely* from the CBA. Because they allege *torts*, however, plaintiffs may proceed under the FELA, even though their injuries are

---

1. Defendant's argument mixes jurisdictional and waiver or estoppel issues. Defendant first contends that the court lacks jurisdiction over plaintiffs' FELA claim because plaintiffs' complaint states only a simple dispute over the interpretation of the CBA. See Appendix D of the Collective Bargaining Agreement between defendant and the ATDA:

> (4) Any Train Dispatcher shall have the right to bring to the attention of the management, directly or through his designated and authorized representative, any conditions or practices involving safety and train dispatchers' service, or involving working conditions of the train dispatchers not covered by existing agreements or agreements that may hereafter be negotiated between railroads and train dispatchers.
>
> Among the subjects which fall within the scope of this agreement are the following: Adequate force.

Rest days.
Extent of dispatching territory.
Number of communicating circuits.
Number of train sheets and train order books to be handled.
Use of train dispatching circuits.
Location of office at points where train dispatchers are employed.
Privacy and elimination of noise and interference.
Proper equipment and arrangement of office.
Lighting, heating, cooling, ventilation, etc.
Proximity of wash rooms, toilets, etc.
Proper drinking water conveniently located.
Method of recording Motor and/or Track Car Line-ups.

Second, defendant suggests that plaintiffs have waived their rights to sue under the FELA by failing to file formal grievances with the NRAB. The holding of this court satisfactorily addresses both issues.

stress-related or emotional in nature. This interpretation of the FELA is supported by *Buell.*

Unwilling to rely solely on the argument that *any* injury caused by a condition that could have been the subject of a grievance under the RLA is not actionable under the FELA, petitioner and various amici argue, in the alternative, that the RLA requires that a narrow 'emotional injury' exception be carved out of the FELA. Because they fear that many workers alleging emotional injuries are really complaining of unhappiness arising out of everyday workplace disputes, they ask us to hold that the RLA provides the exclusive remedy for this ill-defined class of injuries. Even if we were to find some authority allowing us to rewrite the FELA in this manner, we are not persuaded it would be appropriate to do so. There is no basis for assuming that allowing FELA actions for emotional injury will wreak havoc with the general scheme of RLA arbitration [footnote omitted], and absent an intolerable conflict between the two statutes, we are unwilling to read the RLA as repealing any part of the FELA.

*Buell,* 480 U.S. at 566–67, 107 S.Ct. at 1416–17, 94 L.Ed.2d at 573–74.

Plaintiffs' complaints have recited the magic words conferring FELA jurisdiction on this court. Defendant's motion for summary judgment will, therefore, be denied to the extent it suggests otherwise. A more interesting question remains: whether plaintiffs' stress-related "injuries" are cognizable under the FELA.

## III. FELA and STRESS–RELATED "INJURIES"

Three of the four named plaintiffs exhibit symptoms of physical and psychological illnesses allegedly brought about by the negligent or intentional conduct of Conrail. One plaintiff's symptoms, however, are only emotional in nature. The court, there-fore, must determine whether wholly emotional or physical injuries or illnesses caused by the negligent or intentional imposition of stressful job responsibilities are cognizable under the FELA.

Courts have struggled with these issues in recent years and, not surprisingly, have failed to reach a consensus. The United States Supreme Court declined to bring some order to this unsettled area of the law in *Buell,* in which it was asked to decide whether a plaintiff may recover for purely emotional injuries under the FELA. In *Buell v. Atchison, Topeka and Santa Fe Ry. Co.,* 771 F.2d 1320 (9th Cir.1985), *aff'd in part and vacated in part, Buell,* 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) (hereinafter, *"Buell (9th)"*), the Court of Appeals had concluded that a railroad employee who allegedly had suffered a psychological breakdown due to the intentional and negligent harassment and intimidation of co-workers stated a claim under the FELA. A unanimous Supreme Court, however, proceeded more cautiously, leaving the resolution of this question for another day:

The question whether 'emotional injury' is cognizable under the FELA is not necessarily an abstract point of law or a pure question of statutory construction that might be answerable without exacting scrutiny of the facts of the case. Assuming, as we have, that FELA jurisprudence gleans guidance from the common-law developments, *Urie v. Thompson,* 337 U.S., [sic] [163] at 174, 93 L.Ed. 1282, 69 S.Ct. 1018 [at 1027], whether one can recover for emotional injury might rest on a variety of subtle and intricate distinctions related to the nature of the injury and the character of the tortious activity. For example, while most States now recognize a tort of intentional infliction of emotional distress,[2] they vary in the degree of intent

---

**2.** "'The tort of intentional infliction of mental distress as described in [section] 46 of the Restatement [(Second) of Torts] can be safely characterized as the general rule in the United States.... As of 1977, 37 jurisdictions had rec-ognized the tort.' *Leithead v. American Colloid Co.,* 721 P.2d 1059, 1066 (Wyo.1986)." *Buell,* 480 U.S. at 568 n. 16, 107 S.Ct. at 1417 n. 16, 94 L.Ed.2d at 575 n. 16.

required to establish liability,[3] and the level of physical manifestation of the emotional injury required to support recovery.[4] Moreover, some States consider the context and the relationship between the parties significant, placing special emphasis on the workplace. [Footnote omitted]. In addition, although many States have now recognized a tort of negligent infliction of emotional distress,[5] they too vary in the degree of objective symptomatology the victim must demonstrate.[6] These issues are only exemplary of the doctrinal divergences in this area. In short, the question whether one can recover for emotional injury may not be susceptible to an all-inclusive 'yes' or 'no' answer. As in other areas of the law, broad pronouncements in this area may have to bow to the precise application of developing legal principles to the particular facts at hand.

*Buell,* 480 U.S. at 568–70, 107 S.Ct. at 1417–18, 94 L.Ed.2d at 575–576.

Although the Supreme Court in *Buell* did not state explicitly that emotional injuries are cognizable under the FELA, its discussion of conflicting state law and reluctance to make any "broad pronouncements" certainly suggests that *some* emotional injuries are cognizable. This interpretation of *Buell* is supported by earlier cases in which the Supreme Court made very clear that the FELA is to be construed liberally.

For example, in *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), the Supreme Court determined that silicosis is an "injury" under the FELA.

[T]he breadth of the statutory language, the Act's humanitarian purposes, its accepted standard of liberal construction in order to accomplish those objects, the absence of anything in the legislative history indicating a congressional intent to require a restricted interpretation or expressly to exclude such an occupational disease, and the trend of existing authorities dealing with the question, combine to support this conclusion.

We recognize of course that, when the statute was enacted, Congress' attention was focused primarily upon injuries and death resulting from accidents or interstate railroads. [Footnote omitted]. Obviously these were the major causes of injury and death resulting from railroad operations. But accidental injuries were not the only ones likely to occur. And nothing in either the language or the legislative history discloses expressly any intent to exclude from the Act's coverage any injury resulting 'in whole or in part from the negligence' of the carrier. If such an intent can be found, it must be read in to the Act by sheer inference.

The language is as broad as it could be framed: 'any person suffering injury while he is employed'; 'such injury or

3. "The Restatement [section] 46(1) sets forth an 'intentionally or recklessly' standard. Many jurisdictions have adopted this test. [Citations omitted.] Others apply different standards. [Citations omitted.]" *Buell,* 480 U.S. at 569 n. 17, 107 S.Ct. at 1417–18 n. 17, 94 L.Ed.2d at 575 n. 17.

4. "One leading commentary states that '[i]n the great majority of cases allowing recovery the genuineness of the mental disturbance has been evidenced by resulting physical illness of a serious character.' W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 64 (5th ed. 1984). The American Law Institute urges that as long as the distress is 'genuine and severe,' bodily harm should not be required. Restatement [section] 46(k). Many jurisdictions have adopted the Restatement's approach, [citations omitted]. Others, however, appear to be more demanding in their scrutiny. [Citations omitted]." *Buell,* 480 U.S. at 569 n.

18, 107 S.Ct. at 1418 n. 18, 94 L.Ed.2d at 575 n. 18.

5. "For example, while the traditional rule was that a plaintiff could not recover for mental injuries unconnected with actual or threatened impact, the majority of jurisdictions now appear to have abandoned that rule. [Citations omitted]." *Buell,* 480 U.S. at 569 n. 20, 107 S.Ct. 1418 n. 20, 94 L.Ed.2d 576 n. 20.

6. "As the Wyoming Supreme Court recently observed: '[A]mong the courts that recognize the cause of action for negligent infliction of emotional distress, there is a great deal of variation in the damages they allow.' [Citations omitted.] Some courts require an objective showing of physical symptoms to recover for negligent, but not intentional, infliction of emotional distress. [Citation omitted.]" *Buell,* 480 U.S. at 569 n. 21, 107 S.Ct. 1418 n. 21, 94 L.Ed.2d 576 n. 21.

death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier'; 'by reason of any defect or insufficiency, due to its negligence, in its cars, engines appliances,' etc. On its face, every injury suffered by any employee while employed by reason of the carrier's negligence was made compensable. The wording was not restrictive as to the employees covered; the cause of injury, except that it must constitute negligence attributable to the carrier; or the particular kind of injury resulting.

To read into this all-inclusive wording a restriction as to the kinds of employees covered, the degree of negligence required, or the particular sorts of harms inflicted, would be contradictory to the wording, the remedial and humanitarian purpose, and the constant and established course of liberal construction of the Act followed by this Court. [Footnote omitted.]

*Urie*, 337 U.S. at 180–182, 69 S.Ct. at 1030, 93 L.Ed. at 1298–1299. *See also, Jamison v. Encarnacion*, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082 (1930) ("negligence" interpreted to include some intentional torts).

Among lower courts that have considered emotional injuries in the FELA context, the Ninth and Seventh Circuits have adopted opposing views. "The law of [the ninth] circuit is that railroad employee may assert claims under [the FELA] for wholly mental injury." *Taylor v. Burlington Northern Railroad Co.*, 787 F.2d 1309 (9th Cir.1986) (railroad employee alleged that harassment by railroad foreman caused him to suffer paranoid schizophrenia). The Seventh Circuit, however, does not permit recovery for emotional injuries without physical contact or the threat of physical contact. *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807 (7th Cir.1985), *cert. denied*, 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987) (railroad worker harassed, intimidated, and assaulted by co-employees).

Our analysis suggests ... that the critical question in this case is simply whether [plaintiff] has stated a claim under the FELA, which means a claim for a violation of one of the traditional 'physical' torts, such as assault, battery, and negligent infliction of personal injury, all of which are torts actionable under the [FELA].

*Lancaster*, 773 F.2d at 815. *See also supra*, at 10; *Hammond v. Terminal R.R. Ass'n of St. Louis*, 848 F.2d 95 (7th Cir. 1988) (follows *Lancaster* where railroad worker alleged that railroad generally harassed him by unfairly criticizing his performance).

The Court of Appeals for the Sixth Circuit has also taken a more conservative approach toward the problem, refusing to permit recovery for intentional infliction of emotional distress under the FELA. Specifically, the court concluded that the language of *Buell* applies only to negligent conduct giving rise to FELA claims of emotional injury. *Adkins v. Seaboard System Railroad*, 821 F.2d 340 (6th Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 452, 98 L.Ed.2d 392 (1987) (railroad worker alleged company conspiracy to dismiss him).

We note that the Court in *Buell* referred only to *negligent* conduct as giving rise to an FELA claim. [Citation omitted.] Although *Buell* notes that the FELA has been held to apply to some intentional torts, [*See Buell*, n. 8], the FELA has not been applied to any intentional torts lacking any physical dimension such as assault. [*See e.g., Lancaster*]. The *Buell* Court expressly declined to decide whether 'purely emotional injuries' are cognizable under FELA, [citation omitted], and we have held that a claim for intentional infliction of emotional distress is not cognizable under the FELA. *Antalek v. Norfolk and Western Co.*, No. 84–3057 (6th Cir Aug. 30, 1984) [742 F.2d 1454 (table) ].

*Id.*, 821 F.2d at 341.

The post-*Buell* attitude of the Fifth Circuit seems more moderate than the dicta of *Yawn* would have suggested. The court implicitly rejected both *Lancaster*'s strict interpretation of the FELA as well as the Ninth Circuit's liberal interpretation of the Act, instead adopting a case-by-case approach. In *Netto v. Amtrak*, 863 F.2d 1210

(5th Cir.1989), an Amtrak police officer who had been questioned about certain reports he had filed and asked to submit to a polygraph exam filed suit claiming to be the victim of "ruthless harassment" during an "unfounded witchhunt." Although the Court of Appeals ultimately concluded that Amtrak was in no way negligent, it refused to adopt an extreme position.

In *Buell,* the Supreme Court, identifying as the purpose of the FELA the creation of a federal remedy for railroad workers injured through the negligence of their employer or their fellow employees, [footnote omitted] 107 S.Ct. at 1413, refused to carve out a narrow exception for purely emotional injuries. The Court, however, left open the question whether purely emotional injuries are cognizable under the FELA. [Citation omitted.] Arguably, the Court limited such claims to situations in which the plaintiff has suffered severe emotional injury as a result of unconscionable abuse. *Id.* at 1416 n. 13, 1417–18. In commenting upon the argument that allowing FELA actions to complement arbitration under the Railway Labor Act would open the floodgates of litigation, the Court Stated: 'This parade of horribles mistakenly assumes that a significant percentage of employees bringing grievances suffer the type of severe emotional injury that has generally been required to establish liability for purely emotional injury and that a significant percentage of employees are subject to the type of unconscionable abuse which is a prerequisite to recovery.' 107 S.Ct. at 1416 n. 13.

Later in its opinion, however, the Court reflects upon the variation among state tort laws [footnote omitted] recognizing claims for intentional or negligent infliction of emotional distress ... The Court, in sum, appears to invite the lower courts to parse the FELA in light of the specific facts of later cases. As the First Circuit has commented about *Buell:* 'We discern from the *Buell* opinion an attempt to leave the door to recovery for wholly emotional injury somewhat ajar but not by any means wide open.' *Moody v. Maine Central Railroad Co.,* 823 F.2d 693, 694 (1st Cir.1987).

*Netto v. Amtrak,* 863 F.2d 1210, 1213.

In another case, *Gaston v. Flowers Transp.,* 866 F.2d 816 (5th Cir.1989), the Fifth Circuit demonstrated that its case-by-case approach would lead to quite moderate results. In *Gaston,* a sailor sued under the Jones Act[7] to recover for mental injury after he saw his half-brother crushed to death between two vessels. The court, applying a traditional negligent infliction of emotional distress analysis, rejected the sailor's claim since he had not been in the "zone of physical danger." The court implied, however, that if the plaintiff *had* been more than a mere bystander, he might have recovered for wholly emotional injury.

Construing these federal workers' compensation acts to cover bystanders' injuries would represent a major departure from existing jurisprudence, as well as a vast extension of potential employer exposure to damages. On the extension of liability side, not one but two significant innovations would be required: permitting a recovery for purely emotional injuries, which only the Ninth Circuit has clearly countenanced in the FELA/Jones Act context, and permitting such a recovery, not for such injuries resulting from physical trauma to the plaintiff, or even from his fear of such trauma to himself, but for emotional injury stemming from witnessing a bad sight—the violent death of another person, in this instance a near relative.

In taking this latter course we would stand alone; no decision to which we are cited or which our research has discovered has done so, and the reason why none has seems clear. For the consequences of creating a compensable bystander's cause of action under these federal worker's compensation acts for seamen and railroaders would be random and wayward ones, multiplying damages incalcul-

---

7. "The standard of liability is the same under both [the FELA and the Jones Act.] [Citations omitted.]" *Gaston,* 866 F.2d at 817.

ably on the basis of factors which are entirely incidental to the operations of the train or vessel and which bear little or no relationship to the safety of that venture—factors such as how many crew members happen to be standing around to observe an incident, whether their vision is obscured by darkness or weather, how close they are to the occurrence, and the like. Because they are irrelevant to that operation, visiting exponential damages on an employer on the basis of such factors is not only random and wayward, but serves in no way to advance the major subsidiary purpose of affording such remedies as those of the FELA/Jones Act to trainmen and seamen: to hold out incentives to their employers to reduce dangers and to operate safely. More, extending such potentially ruinous liability to employers involves evaluating economic trade-offs which we (or any other court) are poorly equipped even to envision, let alone to weigh against each other. [Footnote omitted.]

Finally, there seems to be something incongruous in undertaking such an extension of liability to seamen and railroaders. These have knowingly and voluntarily chosen callings which, while today perhaps not fairly termed dangerous, yet do involve braving certain hazards and are traditionally not well suited to the squeamish or fainthearted. To undertake to enlarge such persons in damages in proportion to the delicacy of their emotional reactions seems a curious policy.

*Id.* at 819–20.[8]

District courts have also struggled in interpreting the FELA. In *Gillman v. Burlington Northern R. Co.,* 673 F.Supp. 913 (N.D.Ill.1987) (railroad foreman witnessed death of co-worker), for example, the court in *Adkins*-esque fashion minimized the holding of *Lancaster,* ultimately concluding that "the negligent infliction of emotional distress—an injury attributable to workplace negligence—should be covered by the FELA." *Id.* at 916.

> The *Lancaster* court defined the 'nonphysical' torts in a way so as to distinguish FELA cases from RLA cases....
>
> The *Lancaster* court was trying to exclude *intentional* infliction of emotional distress, manifested in the form of firing, harassment, or other employee maltreatment, from the reach of the FELA because such situations are more properly covered by the grievance mechanisms of the RLA. [*See Adkins.*]

*Gillman* at 916.

The court in *Gillman,* however, did impose some limitation on recovery by adopting the "zone of physical danger" rule.[9]

> This standard is the best tailored for liability to a bystander under the FELA—the happenstance that another worker instead of the bystander was physically impacted as a result of the employer's negligence should not prevent the bystander from recovering for provable mental injury caused by that negligence. At the same time, the employer's responsibility should be limited only to those employees who were actually placed in danger by that negligence in order to avoid a flood of claims from those with less significant connection to the incident—the 'unforeseeable' plaintiffs. *See Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 162 N.E. 99 (1928). We hold that the 'zone of danger' rule, as announced by the Supreme Court of Illinois in *Rickey* [*see* n. 9, *supra*], most closely follows the purpose of the

**8.** *See also, Kiffe v. Neches–Gulf Marine, Inc.,* 709 F.Supp. 743 (E.D.Tex.1989) (sailor who witnessed death of non-related co-worker and who suffered from purely emotional injuries failed to state a claim under the Jones Act).

**9.** Basically, under [the rule] a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress. This rule does not require that the bystander suffer a physical impact or injury at the time of the negligent act, but it does require that he must have been in such proximity to the accident in which the direct victim was physically injured that there was a high risk to him of physical impact. *Gillman,* 673 F.Supp. at 917, *quoting Rickey v. Chicago Transit Authority,* 98 Ill.2d 546, 75 Ill. Dec. 211, 215, 457 N.E.2d 1, 5 (1983).

FELA—to protect the security of the worker from 'physical invasions or menaces.' *Lancaster*, 773 F.2d at 813.[10]

*Id.* at 917.

In another case pre-dating *Buell*, *Welby v. Consolidated Rail Corp.*, 671 F.Supp. 1015 (M.D.Pa.1987), the "[p]laintiff [allegedly] suffered a myocardial infarction resulting from improper and unsafe working conditions imposed by defendant." *Id.* at 1017. The district court "agree[d] with the rationale in *Yawn* that if an employee can establish physical injury caused by carrier negligence, he is entitled to damages under the FELA." *Id.*

In *Halko v. New Jersey Transit Rail Operations, Inc.*, 677 F.Supp. 135 (S.D.N.Y.1987), the widow of a Conrail employee sued the railroad for negligence—namely, failing to properly hire, train, and supervise its management. Plaintiff asserted that various episodes of general harassment caused her husband to commit suicide. The court concluded that the "injury alleged is cognizable under FELA." *Id.* at 141.

Recently, courts in several circuits have found that a claim for the negligent infliction of emotional distress is cognizable under the FELA. [*See Taylor ... Gillman...*]

The court notes (1) that *Lancaster* was decided before *Buell*, and (2) the *Lancaster* court was faced with a claim for the *intentional* not *negligent* infliction of emotional distress.

*Id.* at 139–140.

In *Amendola v. Kansas City Southern Ry. Co.*, 699 F.Supp. 1401 (W.D.Mo.1988), the issue was "whether plaintiffs' alleged increased risk of contracting asbestos-related diseases in the future, absent a manifestation of physical injury, constitutes a sufficient present injury compensable under the F.E.L.A." *Id.* at 1403. After concluding that "the tort of negligent infliction of emotional distress is covered by the F.E.L.A., because it is clear that a majority of states now recognize the tort," the court

required that "a claim under the F.E.L.A. for emotional distress, negligently caused, ... be accompanied by allegations of physical harm which either caused or was caused by the emotional distress." *Id.* at 1408–49.

The requirement will serve to limit trivial, frivolous or premature claims. The Court has declined to adopt the strictest variation of the tort of negligent infliction of emotional distress which requires a physical injury as a *precondition* to recovery for emotional distress.

*Id.* at 1411.

The district court in *Althoff v. Consolidated Rail Corp.*, No. 87–4384, slip. op., 1988 WL 61734, 1988 U.S.Dist.Lexis 5343 (E.D.Pa. June 13, 1988), also applying traditional negligent infliction of emotional distress analysis, expanded the possibility of recovery beyond the "zone-of-injury" or bystander contexts.

While plaintiff was seated behind the control panel, a timber fell from the crane and instantly killed another individual ... Although plaintiff did not see the actual lethal contact, he saw the deceased almost immediately after the tragedy and became, understandably, distraught.

\* \* \* \* \* \*

There is no dispute that plaintiff did not witness the injury of his co-employee; nor was he within the zone of danger of the accident's occurrence. The cases cited by the defendant to support his argument are distinguishable, however, from the case at bar, since the plaintiff was not a passive bystander, but an active participant in the events giving rise to the accident: plaintiff was the operator of the device which turned out to be the prime mover of the events which culminated in [plaintiff's] destruction. Plaintiff was the man at the helm, and that the crane itself may have been temporarily static does not place him in the true position of a mere bystander, tantamount to sitting in the center field bleachers watching the goings on.

---

10. "We note also that the zone of danger rule is 'said to have become the majority rule in this country.' [Citations omitted.]" *Gillman*, 673 F.Supp. at 917 n. 1.

The defendant's concern, that permitting plaintiff to recover will open wide the floodgates of litigation, is overstated. It will be the unusual case where a claim for negligent infliction of emotional distress flows from an accident in which the plaintiff played a determining role. This is because in such cases, harm to a third party is very often the result of those involved in the cause of the accident being negligent, which allegedly is not the situation of the plaintiff in this action.

\* \* \* \* \* \*

Taking into account the unique fact pattern of the case before me, the foreseeability [of] plaintiff's emotional injury and its physical manifestation, as well as the liberal policies underlying the FELA, I conclude that summary judgment is inappropriate in this instance.

*Id.* at ——.

In *Bennett v. Consolidated Rail Corp.*, No. 88–3337, slip op., 1988 WL 94280, 1988 U.S.Dist.Lexis 10012 (E.D.Pa. September 12, 1988), a trainman who had been disciplined following a derailment sued for intentional infliction of emotional distress. Although "[i]t was not clear whether this claim [was] brought under state law or under the [FELA]," the court had no difficulty granting defendant's motion to dismiss, concluding that Conrail's conduct was simply not outrageous.

> Under the FELA, a claim based on emotional distress must be the result of outrageous conduct or 'unconscionable abuse.' [*Buell*, 480 U.S. at 567 n. 13, 107 S.Ct. at 1417 n. 13], 94 L.Ed.2d at 574 n. 13; *Accord Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir.1979) (*en banc*). Outrageous conduct is conduct which is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' *Bangert v. Harris*, 553 F.Supp. 235, 238 (M.D.Pa.1982) (quoting Restatement (Second) of Torts, [section] 46, comment d). I have reviewed the acts alleged to have been perpetrated by the defendant towards the plaintiff and, despite a liberal construction of the complaint, I find that they are not sufficiently extreme or extraordinary such that a reasonable person would find them to be outrageous.

Finally, in *Teague v. National Railroad Passengers Corp.*, 708 F.Supp. 1344 (D.Mass.1989), a management employee of Amtrak sued for both intentional and negligent infliction of emotional distress under the FELA. He "assert[ed] that his superiors subjected him to 'embarrassment, humiliation, harassment, degradation, and other severe emotional distress' through their treatment of him." *Id.* at 1345. In concluding that plaintiff stated a claim for both the intentional and negligent conduct of the railroad, the court in *Teague* turned the defendant's "legislative history" argument on its head, imposing on defendant the "informal burden" of explaining why plaintiffs did *not* state a claim.

> Although intentional and negligent infliction were not recognized as torts in 1906 when the FELA was enacted, most jurisdictions now recognize both torts. . . .
>
> [T]he *Gillman* court chose severely to limit recovery under the FELA for the negligent infliction of emotional distress to plaintiffs within the zone of danger. In so doing, the court sought to follow what it perceived to be "the purpose of the FELA—to protect the security of the worker from 'physical invasions or menaces.' ". . . .
>
> The Court respectfully rejects such a narrow reading of a statute meant to be broadly interpreted. . . . The first problem with the *Gillman* court's analysis is that it attempts to divine the 'original intent' of the FELA's framers about a tort which, the court admits, did not exist at the time the FELA was passed in 1906. . . .
>
> This reasoning, articulated more or less explicitly, seems to infect as it informs many of the decided cases. *See, e.g., Lancaster* . . . The drafters of the FELA, so the argument runs, were concerned only with providing relief to those workers who suffered the classic physical injuries—the broken bones and man-

gled limbs—that accidently, but inevitably, befall the workers of an industrial nation. Such rarefied afflictions as emotional distress were not at all what the drafters contemplated. Thus, to be true to Congress' intent, courts must limit recovery under the FELA to those anticipated injuries and to emotional distress only when it is caused by physical injury or the immediate danger thereof.

\* \* \* \* \* \*

The vision of the drafters of law is necessarily historically limited. The members of Congress who drafted the FELA simply could not have had an opinion about a tort that the common law itself had not yet recognized..... Like the Constitution, it is far more fruitful to view the FELA as a living, growing document than as a fossilized one. The Supreme court has recognized this principle in its teaching that 'FELA jurisprudence gleans guidance from common law development.' *Buell,* 480 U.S. at 568 [107 S.Ct. at 1417]... Indeed, to the extent the Supreme Court has divined any principle of original intent with respect to the FELA, it is the general one that the FELA is a broad statute meant to be even more broadly interpreted.

*Id.* at 1347–49.

Indeed, the tort of intentional infliction of emotional distress appears not to have existed at common law in 1906 when the FELA was enacted.... This factor alone, while perhaps not enough in itself to persuade the Court to hold intentional infliction cognizable under the FELA, at least some would seem to place an informal burden on AMTRAK to articulate why this Court should dismiss such a claim.

*Id.* at 1352–53.

With respect to the negligent infliction of emotional distress claim, the court correctly observed that

[t]he law is becoming settled that a claim for the negligent infliction of emotional distress is cognizable under the FELA. *See Amendola* ...; *Althoff* ...; *Gillman* ...

\* \* \* \* \* \*

The courts that have considered this issue since *Buell* have uniformly held negligent infliction cognizable under the FELA, [footnote omitted] and differ only on the elements necessary to make out such a claim. Some courts have held that such a claim requires an objective physical manifestation of emotional distress, but no physical impact. *See Amendola* ... Other courts have employed the older 'zone of danger' test requiring that although a claimant need not exhibit physical injury, she must have been placed in immediate physical danger by the negligence of the employer. *See Gillman* ... (suggesting, but not deciding, that such is the test for a FELA negligent infliction claim.) Still another court has held that it is enough to avoid summary judgment where one does not exhibit any physical manifestation, was not in the zone of danger, did not witness another's injury, but did operate the instrumentality of another's death. *Althoff* ...

*Id.* at 1346–47.

The *Teague* court ultimately adopted the majority state court rule as a proper statement of federal common law:

The Supreme Court [in *Buell*] did not rule—though the factual record before it was sufficiently developed had it wished to address the point—that the plaintiff was barred form recovery for negligent infliction of emotional distress for mere harassment because his injury was not caused by 'physical invasions or menaces.' [Footnote omitted.] Moreover, the Supreme Court did not even direct the district court to consider whether the FELA reached emotional distress not caused by 'physical invasion or menaces.' Rather ... the Supreme Court's treatment of the issue merely recited the various ous common debates in the run-of-the-mill state common law case, devoid of all concerns particularized to the FELA.

With these significant silences of the Supreme Court in mind, this Court therefore rejects the *Gillman* approach to the extent that it permits recovery *only* if the "zone of danger" test is satisfied. In

addition to permitting recovery under such circumstances, the Court also adopts the common law majority rule that actual or threatened impact is unnecessary to a negligent infliction claim under the FELA and that objective symtomatology of the mental distress will suffice. That is to say, this Court adopts the elements of the tort as stated by the Massachusetts Supreme Judicial Court: '(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.' [Footnote omitted.]

*Id.* at 1349–50.

With respect to the plaintiff's intentional infliction of emotional distress claim, the court explained that:

[i]t is now clear beyond peradventure that the FELA covers at least some intentional torts. [Citations of cases dealing with assault and false arrest omitted.]

In determining more exactly the type of intentional conduct covered by the term 'negligence' in the FELA statute, one must return to *Jamison.* ...

For a variety of reasons, this Court is convinced that the FELA covers the claim of intentional infliction of emotional distress alleged here. First, the intentional infliction, as alleged, appears to have had, at least in part, been designed to further AMTRAK's business ... Moreover ... the FELA covers the same injuries where they have been caused by negligence. Thus, as the *Jamison* court concluded, it would be unreasonable and against Congress' intent to hold that the analogous intentional tort is not covered.

*Id.* at 1350–51.

## IV. DISCUSSION

■ A review of the case law reveals that most courts—including the Supreme Court [11]—have proceeded to analyze the reach of the FELA in the context of traditional tort law—that is, by requiring plaintiffs who allege purely emotional or stress-related physical injuries to state a claim for intentional or negligent infliction of emotional distress. Of course, the recovery requirements of these torts vary from state to state, leaving federal courts—who must apply federal common law [12]—much room to disagree among themselves.

Despite these disagreements, however, the incorporation of external tort requirements into the FELA wisely builds into it a vehicle for considering the conflicting interests of plaintiff, defendant, and society in general. Without some such limiting principles, both state and federal courts would be required to reinvent the emotional-injury wheel for the purposes of certain FELA claims.

Applying traditional tort analysis, the court concludes that plaintiffs have not stated claims for intentional infliction of emotional distress, as they have failed to allege "OUTRAGEOUS" conduct. *See* Section 46(1) of the Restatement (Second) of Torts and comment d:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

d. ... The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so out-

---

**11.** The Court's lengthy discussion, both in the text and footnotes of *Buell,* dealing with state court interpretations of the two common law torts suggests that it intended lower courts to proceed utilizing such an analysis.

**12.** *Urie,* 337 U.S. at 174, 69 S.Ct. at 1027, 93 L.Ed. at 1295.

rageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's [sic] feelings are hurt.

*See also, Buell* n. 16 ("The tort of intentional infliction of mental distress, as described in [section] 46 of the Restatement can be safely characterized as the general rule in the United States").

■ Determining whether plaintiffs have stated claims for negligent infliction of emotional distress is more difficult, however, as the common law—as evidenced by the cases cited herein—is less clearly defined and in a stage of rapid evolution. Although neither plaintiffs [13] nor defendant [14] reviewed state tort law in their memoranda of law, a recent article carefully surveys each jurisdiction and tracks the evolution of the negligent infliction tort.

Comment, *Negligent Infliction of Mental Distress: A Jurisdictional Survey of Existing Limitations Devices and Proposal Based on an Analysis of Objective Versus Subjective Indices of Distress,* 33 Vill.L. Rev. 781–833 (1988).

As of the article's publication date [15], five states and the District of Columbia permitted recovery for negligent infliction of emotional distress only to plaintiffs who suffered a contemporaneous physical injury or "physical impact", *Id.* at 792–93; seventeen states limited recovery to plaintiffs "who are foreseeably placed at risk of physical harm by the conduct at question" ("zone of danger" requirement) or those who can prove "a physical injury as the direct and natural result of the initial emotional distress" ("physical manifestation" requirement), *Id.,* 794–98; and eighteen states had already adopted or expressed a willingness to adopt—with some degree of variation and with some states requiring a showing of physical manifestation—the foreseeability analysis outlined in *Dillon v. Legg,* 68 Cal.2d 728, 441 P.2d 912, 69 Cal.Rptr. 72 (1968) (en banc).[16]

As can be seen from the state and federal cases, the type of conduct that has led to the evolution of the negligent infliction tort is simply not the type of conduct alleged in the case at bar. Negligent infliction recovery in state courts has been limited primarily to those plaintiffs who allege some kind of specific physical contact. Even in federal courts, where creative lawyering has expanded the limits of intentional and negligent infliction in the FELA context, plaintiffs have usually alleged physical impact

**13.** Because plaintiffs reject a traditional tort analysis, they would have little reason to review varying state interpretations of the two common law torts.

**14.** Defendant cites only to federal and Pennsylvania state court opinions, suggesting (somehow) that Pennsylvania law applies.

**15.** The court has not reviewed the law of each state to discover any changes that might have occurred since the publication of this article.

**16.** "The court fashioned a now well-known set of factors or guidelines which future courts would take into account in determining whether

a defendant should reasonably have foreseen injury to a particular plaintiff:

> (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship."

Comment, *supra,* at 804.

on themselves or third parties, *see, Gaston, Gillman,* and *Althoff, supra,* (plaintiffs witnessed accidental death or body immediately after accident), or at least incidents of offensive conduct directed specifically at them, *see, Buell (9th), Taylor, Lancaster, Hammond, Netto, Halko,* and *Teague,* (allegations of harassment, intimidation or assault) and *Adkins* (conspiracy to dismiss plaintiff), *supra.* Only *Welby, supra,* (myocardial infarction allegedly caused by working conditions) dealt with a situation similar to the one at bar.

Recovery for negligent infliction of emotional distress in this case should be limited for the reasons so often outlined by other courts—namely, a fear of (1) incalculable and potentially unlimited damages, (2) a flood of litigation brought by disenchanted workers, and (3) fraud. These, at least, are the explicit reasons given by courts who might also sense—but cannot explicitly acknowledge—some problem with causation or foreseeability or, perhaps, some feeling that the plaintiff "assumed the risk"[17] of contracting stress-related illnesses by voluntarily accepting stressful positions.[18] Generally, these articulated and unarticulated views are reactions to the application of the "thin skull rule" to claims where the offensive element is not a physical touch-

ing of plaintiff, nor the sight of injury or illness to another, but as Judge Posner wisely wrote, "too much—not too dangerous—work." *Lancaster,* 773 F.2d at 813. Indeed, plaintiffs in the case at bar were allegedly injured by performing the normal duties of their jobs as structured by management and as monitored by the union. As work rules and working conditions represent issues that are at the heart of labor-management negotiations, the court will not upset the delicate balance of the collective bargaining agreement absent a more compelling reason.

For these reasons, plaintiffs, who allegedly suffer from stress-related physical or purely emotional[19] injuries or illnesses caused by their general working conditions, fail to state a claim under the FELA. Lawyers, doctors, bus drivers, police officers, laborers, and, yes, even judges, face stressful conditions every working day. To suggest that Congress intended to single out railroad workers (and seamen under the Jones Act) as worthy of special protection from such stress would be pure folly. Job-related stress is simply not the type of problem intended to be dealt with by the FELA.

For the foregoing reasons, defendant's motions for summary judgment will be

---

**17.** Certain specific employer defenses were abrogated by the FELA (e.g., contributory negligence, assumption of the risk, and the fellow servant rule). *See Jamison, supra.*

**18.** There is some element of "assumption of the risk" analysis in defendant's contention that plaintiffs cannot prove negligence since their working conditions were the product of collective bargaining.

**19.** "Jurisdictions allowing recovery for emotional distress without proof of physical harm [footnote omitted] in negligence cases are clearly in the minority." *Payton v. Abbott Labs,* 386 Mass. 540, 545, 437 N.E.2d 171, 174–75 (1982). *See also,* Restatement (Second) of Torts [section] 436A (1965), which

> sets forth what is still the rule adhered to by the majority of American courts: 'If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emo-

tional disturbances.' The cases generally hold that physical harm is required but (in accordance with the Restatement ... [section] 436[2] ...), the harm need not be caused by impact or trauma; physical harm resulting from emotional stress is sufficient.

\* \* \* \* \* \*

The reasons for the majority rule are, at least three. One is that emotional disturbance which is not so severe or serious as to have physical consequences is likely to be 'so temporary, so evanescent and so relatively harmless' that the task of compensating for it would unduly burden defendants and the courts. The second is that, in the absence of the guarantee of genuineness provided by resulting bodily harm, such emotional disturbance can be too easily feigned or imagined. The third is that where the defendant's conduct has been merely negligent, without any element of intent to harm, his fault is not so great that he should be required to make good a purely emotional disturbance. Restatement (Second) of Torts ... [section] 436A, comment b.

*Payton,* 437 N.E.2d at 178–79.

granted.[20]  An appropriate order follows.

---

**20.**  Even if the court were not to incorporate the elements of intentional and negligent infliction into its FELA analysis, it would still grant defendant's motions for summary judgment for the reasons reasons stated above.